IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

PHYLLIS COACHMAN, ANTHONY
GILHUYS, KATHERINE JAMES, and
DEROY MURDOCK,

*Plaintiffs*,

v.

THE CITY OF NEW YORK and THE NEW YORK
CITY BOARD OF ELECTIONS,

*Defendants*.

Civil Case No. _____

# COMPLAINT

Plaintiffs, Phyllis Coachman, Anthony Gilhuys, Katherine James, and Deroy Murdock, bring this Complaint against Defendants the City of New York (the "City") and the New York City Board of Elections (the "Board"), and allege as follows:

## INTRODUCTION

1. This lawsuit is a civil rights action pursuant to the Fifteenth Amendment of the United States Constitution ("Fifteenth Amendment") and Section 2 of the Voting Rights Act of 1965 ("Voting Rights Act"), 52 U.S.C. § 10301, which prohibit Defendants from enforcing any election procedure that was enacted with an impermissible racial intent. The New York City Council ("Council") enacted a law—Local Law 11—that alters who may vote in New York City elections by allowing the registration of noncitizens to vote. Local Law 11 violates the Fifteenth Amendment and the Voting Rights Act because it was passed with an impermissible racial intent.

2. Plaintiffs, four registered voters in New York City who are Black, were injured the moment Local Law 11 was passed. *See Catholic League for Religious and Civil Rights v. City & County of San Francisco,* 624 F.3d 1043, 1052 (9th Cir. 2010) (en banc) ("The cause of the

1

plaintiffs' injury here is not speculative: it is the resolution itself."). Plaintiffs will continue to suffer an actual, ongoing, concrete injury that is directly traceable to this discriminatory law that can only be redressed by a favorable decision by this Court. *See e.g., Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 70 (2d Cir. 2019). Plaintiffs seek an injunction prohibiting Defendants from registering noncitizens to vote and/or otherwise enforcing and implementing Local Law 11, a declaratory judgment that Local Law 11 is unconstitutional, compensatory and nominal damages, and attorneys' fees, expert fees, litigation expenses and costs, pursuant to 52 U.S.C § 10310(e) and 42 U.S.C. § 1988.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1343 and 52 U.S.C. § 10308(f) because this action alleges violations of the United States Constitution and federal civil rights laws.

4. This Court has jurisdiction to grant declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

5. Venue in this Court is proper under 28 U.S.C. § 1391(b)(1) because the Board has offices within this District and all Defendants are located within the City of New York, and under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

## PARTIES

6. Plaintiff Phyllis Coachman is a registered voter in the City of New York. Ms. Coachman is Black.

7. Plaintiff Anthony Gilhuys is a registered voter in the City of New York. Mr. Gilhuys is Black.

8. Plaintiff Katherine James is a registered voter in the City of New York. Ms. James is Black.

9. Plaintiff Deroy Murdock is a registered voter in the City of New York. Mr. Murdock is Black.

10. Defendant City of New York is a municipal entity created and authorized under the laws of the State of New York. Defendant City of New York is a municipality in the United States and is obligated to comply with both the Fifteenth Amendment to the United States Constitution and Section 2 of the Voting Rights Act.

11. Defendant Board of Elections is a public agency of the City of New York responsible for voter registration and election administration and is required to enforce all City voting laws.

## FACTUAL AND LEGAL ALLEGATIONS

### Background

12. On December 9, 2021, the Council, the legislative body for the City, passed a bill referred to as Intro 1867-A (the "Bill"), titled "A Local Law to amend the New York City charter, in relation to allowing lawful permanent residents and persons authorized to work in the United States in New York City to participate in municipal elections." Local Law No. 11 of 2022, *available at* https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4313327&GUID=DF600BDA-B675-41D8-A8BD-282C38DC4C62, also attached as **Exhibit 1** (hereinafter "Local Law 11" or the "Law").

13. Under the Law, "eligible municipal voters shall have the right to vote in municipal elections and shall be entitled to the same rights and privileges as U.S. citizen voters with regard to municipal elections." **Exhibit 1** at 4, § 1057-bb.

3

14. Defendant Board is or will be enforcing Local Law 11 as part of its duties to administer elections in the City.

15. Local Law 11 violates the Fifteenth Amendment and Section 2 of the Voting Rights Act because it was adopted with impermissible racial intent. It was the explicit intent of the Law's sponsors to increase the voting strength of certain racial subgroups while simultaneously decreasing the voting strength of other racial subgroups. An election law enacted with any racial intent or purpose is unconstitutional under the Fifteenth Amendment and Section 2 of the Voting Rights Act. As the Supreme Court of the United States has stated, "There is no room under the Amendment for the concept that the right to vote in a particular election can be allocated based on race." *Rice v. Cayetano*, 528 U.S. 495, 523 (2000).

16. The Fifteenth Amendment provides, in pertinent part: "The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." U.S. Const. amend. XV, § 1.

17. The "Fifteenth Amendment's prohibition on race-based voting restrictions is both fundamental and absolute." *Davis v. Guam*, 932 F.3d 822, 832 (9th Cir. 2019) (citing *Shaw v. Reno*, 509 U.S. 630, 639 (1993)). Because "'[t]here is no room under the Amendment for the concept that the right to vote in a particular election can be allocated based on race,'" the levels of scrutiny used to examine other constitutional restrictions are not relevant to election procedures enacted with a racial purpose. *Id*. (citing *Rice*, 528 U.S. at 523).

18. Election procedures that are facially neutral violate the Fifteenth Amendment if they are adopted with a racially discriminatory purpose. *See Reno v. Bossier Parish Sch. Bd.,* 520 U.S. 471, 481 (1997). "Racial discrimination need only be one purpose, and not even a primary purpose, of an official act" in order to violate the prohibitions on election procedures enacted with

a racially discriminatory intent. *Velasquez v. City of Abilene*, 725 F.2d. 1017, 1022 (5th Cir. 1984) (citing *Arlington Heights v. Metropolitan Development Housing Corp.*, 429 U.S. 252, 265 (1977)). The Supreme Court has held that "[d]iscriminatory intent is simply not amenable to calibration. It either is a factor that has influenced the legislative choice or it is not." *Pers. Admin. of Mass. v. Feeney*, 442 U.S. 256, 277 (1979). Once racial intent is demonstrated, it is no defense to claim the same law would have been enacted regardless of the racially discriminatory motive. *See Askew v. City of Rome*, 127 F.3d 1355, 1373 (11th Cir. 1997). If race played any role at all in the enactment of an election procedure, that procedure violates the Fifteenth Amendment.

19. Proof of racial animus or hatred is not necessary to prove an unconstitutional racial intent in enacting an election procedure. Actions taken with the intent of effectuating a disproportionately negative impact on a racial group are violative of the intent standard of the Fifteenth Amendment. *See e.g. Garza v. County of Los Angeles*, 918 F.2d 763, 778 (9th Cir. 1990) (Kozinski, J., concurring and dissenting in part).

20. Plaintiffs may prove violations of both the Fifteenth Amendment and Section 2 of the Voting Rights Act either through direct evidence or indirect evidence of impermissible racial intent. Both direct and indirect evidence of racial intent infect the enactment of Local Law 11.

21. In *Arlington Heights*, the Supreme Court considered what indirect evidence should be considered in determining whether elected officials acted with an impermissible racial intent. Often referred to as "the *Arlington Heights* factors*,*" they include (1) whether the official action bears more heavily on one race than another; (2) the historical background of the decision; (3) the sequence of events leading up to the decision; (4) procedural or substantive departures from normal decision making; (5) statements, including the legislative history reflecting on the purpose of the decision. 429 U.S. at 266-68. The list of *Arlington Heights* factors to prove racial intent through

indirect evidence is not exhaustive and a court can consider other relevant factors. *See Overton vs. City of Austin*, 871 F.2d 529, 540 (5th Cir. 1989).

22. Finally, the Fifteenth Amendment is self-executing and does not need any state or federal statutory basis to enforce it. *See Guinn v. United States*, 238 U.S. 347, 367-68 (1915).

**Direct Evidence of Impermissible Racial Intent:
Statements by Council Members Explicitly Discussing Racial Intent**

23. Councilmember Ydanis Rodriguez, a primary sponsor of the Bill, consistently advocated for the Bill to the Council and supporters with an explicit racial purpose.

24. Throughout the September 20, 2021, New York City Council public hearing, Council Member Rodriguez spoke in favor of the Bill in racial terms. *See* Transcript of the Minutes of the Committee on Governmental Operations (Sept. 20, 2021), *available at* https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4313327&GUID=DF600 BDA-B675-41D8-A8BD-282C38DC4C62&Options=&Search=, attached here as **Exhibit 2**. Many of his statements referred to the race of the foreign citizens who would be granted municipal voting rights.

25. In comparing them to those who had voting rights in the 1900s he stated: "[A]t a time where the city today look different than what it looked like in the 1900's" and contrasted those circumstances with the racial composition of an electorate he preferred. **Exhibit 2** at 19.

26. He also stated:

[I]n the Bronx, in Brooklyn, mainly effect people effect people of color in many of those communities. Some people, they don't have a voice to elect their Mayor. To elect the Public Advocate. To elect the Council Member. Yet because we as a city have decided that this city has changed the color of the skin of people coming to this city, then we change it who will be voting in this city.

**Exhibit 2** at 108.

27. Furthermore, in concluding his initial statement of support for this law, Council Member Rodriguez switched to speaking in Spanish. *See* video of the hearing found online at https://legistar.council.nyc.gov/MeetingDetail.aspx?ID=890491&GUID=23147ADF-B417-43D2-B4E1-0F2BC2E98E5C&Search=.

28. When advocating for the bill, Council Member Rodriguez could have confined his advocacy to citizenship status. He did not. Instead, he crossed the bright line drawn by the Fifteenth Amendment and framed his support along racial lines.

29. On December 9, 2021, in response to Council Member Peter Vallone's vote to reconsider the Bill before passage, Council Member and Bill sponsor Antonio Reynoso also crossed the bright line established by the Fifteenth Amendment and framed the debate about the bill along racial lines:

> When white power or white men's power is being attacked, what they consider being attacked, they stand up and they fight. They fight to preserve their power and their influence…. we have to stop and think about this sea of mostly white men that have stood up against this bill at this moment in an effort to preserve their power and influence, and that is exactly what will happen every time you challenge power. The faces always look the same, and it just never fails, and I was hoping that today we could have seen something different. This bill will pass today. It will. Maybe make another effort another time when you reassume power, I guess, to try to undo what I think is the principle foundation of democracy which is the right to vote, specifically if you're paying taxes.

*See* Transcript of the Minutes of the Stated Meeting of the New York City Council (Dec. 9, 2021) at 70-71, *available at* https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=4313327&GUID=DF600BDA-B675-41D8-A8BD-282C38DC4C62&Options=&Search=, attached here as **Exhibit 3**.

### **Indirect Evidence of Racial Intent: Local Law 11 *Bears More Heavily* On the Voting Power of Black Voters**

30. Approximately one million adult noncitizens live in New York City. Those advocating for the bill estimate the number of newly eligible foreign-citizen voters at approximately 900,000. *See About Intro 1867*, Our City, Our Vote, https://ourcityourvote.org (last visited August 28, 2022).

31. According to data from the 2020 American Community Survey of the United States Census, there are approximately 1,300,000 foreign nationals residing in Bronx, Kings, New York and Queens Counties. Of that total, approximately 495,000 are Hispanic and 348,000 are Asian. American Community Survey, U.S. Census Bureau, *available at* https://data.census.gov/cedsci/table?q=United%20States&t=Foreign%20Born&g=0500000US36005,36047,36061,36081&y=2020&tid=ACSST5Y2020.S0501 (last visited August 28, 2022).

32. The sponsors, aware of this racial composition, enacted legislation that by their own words was explicitly designed to alter the racial composition of the New York City electorate.

33. Such racial purposes are prohibited by both the Fifteenth Amendment and Section 2 of the Voting Rights Act. Local Law 11 accomplishes precisely what advocates intended: shifting the electoral power in New York City municipal elections along racial lines to Hispanic and Asian voters and reducing the power of other racial groups, including those of Plaintiffs.

34. New York City has approximately five million active registered voters. The addition of approximately one million foreign-citizen voters could potentially make up almost 20 percent or more of the electorate in future New York City elections. This is greater than the margin of victory in many municipal elections.

35. The City has millions of registered voters, yet elections for local offices are decided by a limited few. Only 24 percent of eligible registrants turned out in the 2021 general municipal

elections. Nolan Hicks, *Less than 1/4 of NYC voters cast ballots in election that saw all seats up for grabs*, N.Y. Post (Nov. 3, 2021), https://nypost.com/2021/11/03/less-than-1-4-of-nyc-voted-in-2021-election-despite-all-seats-up-for-grabs/. Moreover, the 2021 Democrat mayoral primary was decided by fewer than 10,000 votes. Katie Glueck, *Eric Adams Wins Democratic Primary for New York City Mayor*, N.Y. Times (July 6, 2021, Updated Sept. 20, 2021), https://www.nytimes.com/2021/07/06/nyregion/eric-adams-wins.html.

36. The almost one million newly enfranchised foreign-citizen voters have the potential to massively alter municipal elections.

### Indirect Evidence of Racial Intent: *Historical Background of the Decision* Includes Foreseeability of the Burden on a Racial Group

37. At the Council meeting on December 9, 2021, prior to a vote on the Bill, specific concerns were raised by members of the Council about the negative impact on Black citizen voters through the increase in Hispanic foreign-citizen voters.

38. Requests were made by Council Member Laurie Cumbo to send the Bill back to committee for further study concerning the impact on Black voters continued ability to elect candidates, stating:

> *[T]his particular legislation is going to shift the power dynamics in New York City in a major way, and we do not have the numbers or the information to know how that is going to impact* African-American communities who have been the most vulnerable in their existence in New York City . . . .
>
> I've never heard in this one discussion about how is the African - American voter going to be impacted by this bill. This is going to be a great win for the ethnic groups that are going to be the highest number in the City of New York. And so, Ydanis, this is your legacy. This is yours, and this is going to be a huge win numerically for the Dominican Republic community, and I applaud you for that. We're all here to support our ethnic groups, and we're all here to make sure that we all win, but I need to know in supporting this, which I need more time, how are African-Americans going to be impacted, because that's the community I come from. *I'm clear how the Dominican Republic community will benefit, but not the African American community*, and it's only fair that I know that information.

9

**Exhibit 3** at 75-78 (emphasis added).

39. Council Member Robert Cornegy, Jr., who is Black, also voiced similar concerns regarding the impact on Black voters stating:

> I appreciate and respect everyone's immigrant story. However, my ancestors did not come here as immigrants. We came here as slaves and fought vehemently to be able to be a part of the fabric of America and literally die for the right to vote, blood, sweat, and tears, and are still engaged and embroiled in eroding voter rights acts for communities of color across the country. . .
>
> I would be remiss if I didn't remind people that there's one more perspective that we haven't talked about, and that is a different kind of immigrant experience and a different kind of voter rights that we still are suffering throughout the country. We all have applauded the work of voter rights advocates in the south, black women's vote, and all those kinds of things, and that's not being heard or represented sometimes, and *it's not being heard or represented in this bill*. It may very well pass, but like I said, I would be remiss if I didn't offer that perspective of representing a people whose vote has monumentally been taken for granted and now has eroded to the place where even the Voter Rights Act that were put in place to protect our vote and our voices are being eroded.

**Exhibit 3** at 72-73 (emphasis added).

40. Despite the foreseeability of this impact on the voting strength of Black voters and requests for further study to get it right, the Council ignored these pleas and passed the Bill.

41. The Council had the availability of a less discriminatory option, as requested by Council Member Cumbo, to send the Bill back to committee and assess its impact on the Black community's voting strength. Disregarding these concerns, the Council pushed ahead and passed the law. No investigation of the negative impact the Law would have on the voting strength of Black voters was conducted.

### **Indirect Evidence of Racial Intent:** *Significant Procedural Departure*

42. Moreover, in enacting Local Law 11, the Council clearly deviated from the procedures enunciated in New York State Municipal Home Rule Law (the "MHRL").

43. Specifically, Section 23(2)(e) of the MHRL requires that a local law be subject to a "mandatory referendum if it . . .. [a]bolishes an elective office, or changes the method of nominating, electing, or removing an elective officer . . .." N.Y. Mun. Home Rule Law § 23(a)(e).

44. Local Law 11 changes the method of electing city officials by changing who is eligible to vote in those elections. A referendum should have been held to determine if the citizen voters approved of allowing certain foreigners to vote in City elections.

45. Council Member Joe Borelli informed the Council members that Local Law 11 was an improper deviation from procedures to accomplish the goal of giving voting rights to foreign citizens, stating:

> Section 23 of the Municipal Home Rule Law states that a referendum is *required*, not optional, for any Local Law that changes the nominating, electing, or removing an elected officer, and that's what we're doing. So at the very least, my point is, if you want to do this, there's no problem with that as long as you do it the right way. This is not just an opinion of mine, Joe Borelli, the Minority Leader, the Republican leader. In 2013 an Administrative Attorney testified to this body that non-citizen voting is inconsistent with the State Constitution would require a citywide referendum. On 9/17 of this year Mayor de Blasio himself, a bonafide [sic] progressive known to you all, said, "Our Law Department is very clear. It's not legal for this to be decided at the city level. I really believe this has to be decided at the state level." … Two weeks ago, on New York One, the same Democratic Mayor said the same thing. And finally on September 20th of this year, our Chief Democracy Officer, the person who we presume, his only job is to make sure every legal voter in this city has the opportunity to vote, said that the law could violate the State Constitution. So I urge you all to vote yes on this motion. Send this back to committee. Let's talk about these legal issues. If that happens to not [be] the case, then I urge you all to vote no on the bill.

**Exhibit 3** at 56-57 (emphasis added).

46. Moreover, the Council apparently received explicit legal advice from the City Law Department that Local Law 11 was contrary to the New York State Constitution and the MHRL. The receipt of this legal advice, and the brash refusal to follow it, evidences the Council's total disregard for procedure. Simply put, in its zeal to pass this Bill, the Council ignored the New York

State Constitution and the MHRL and decided to expand the electorate to a large class of foreign-citizen voters without the authority to do so.

### Indirect Evidence: *Historic Background* of New York City's Long History of Voting Discrimination

47. New York City has a history of racial discrimination in voting.

48. In *United Parents Associations v. Board of Elections*, a Court determined that two successive legislative enactments regarding NYC's election procedures would result in a racially discriminatory effect on minority voters. As a result, the Defendant, the Board, was prevented from implementing the election procedures. *See United Parents Associations v. Board of Elections*, No. 89 Civ. 0612 (E.D.N.Y. May 6, 1993) (as cited in *Voting Rights in New York City: 1982-2006*, 17 S. CAL. REV. L. & SOCIAL JUSTICE 501, 527, n. 192.)

49. Furthermore, Bronx County, Kings County, and New York County were covered by the Voting Rights Act Section 5 preclearance requirements due to historically low minority registration rates and the enforcement of a literacy test or device. *See Ravitch v. New York*, 1992 U.S. Dist. LEXIS 11481, *2 (S.D.N.Y. Aug. 3, 1992).

50. To obtain preclearance under Section 5, covered jurisdictions were required to demonstrate that voting changes "neither ha[d] the purpose nor w[ould] have the effect of denying or abridging the right to vote on account of race[,] color," 52 U.S.C. § 10304(a), or "member[ship] [in] a language minority group," 52 U.S.C. § 10303(f)(2). The Department of Justice has objected and denied preclearance to proposed election procedures by New York City *nine times*. *See Voting Determination Letters*, found online at https://www.justice.gov/crt/voting-determination-letters-new-york (last visited Aug. 28, 2022).

51. Among the procedures which failed to obtain preclearance under the Voting Rights Act were New York City Council's redistricting plans (Submission No. V6107), and New York City's replacement of an elected school board with appointed trustees (Submission 96-3759). *Id.*

52. Furthermore, there has been litigation under the National Voter Registration Act of 1993 against the State of New York for failure to establish agency-based voter registration in government agencies that serve low-income populations and by extension racial and language minorities in 1996 and 2004. As recently as 2017, the Department of Justice sued the State of New York for failing to provide voter registration opportunities at the Department of Motor Vehicles. *See United States and the State of New York,* Memorandum of Understanding (June 20, 2017), *available at* https://www.justice.gov/crt/case-document/memorandum-understanding (last visited Aug. 28, 2022). These cases were brought statewide for failure to provide registrations throughout the State of New York, including the agencies located in the City.

53. Moreover, courts have catalogued the City's longstanding failures to comply with the Voting Rights Act. *See e.g.*, *Ravitch*, 1992 U.S. Dist. LEXIS 11481 (S.D.N.Y. Aug. 3, 1992).

### Indirect Evidence: Black Voters *Bear the Burden*: Voting in New York City is Racially Polarized

54. Elections in New York City are racially polarized. The addition of nearly a million foreign-citizen voters coupled with the existence of racially polarized voting will have a negative impact on the voting strength of Black voters to a significant degree.

55. The Department of Justice has justified, in part, previous objections to preclearance under Section 5 in New York City on the basis of this racially polarized voting. In reviewing a Congressional redistricting plan in 1992, preclearance was denied in part due to racially polarized voting in upper Manhattan. In denying preclearance, the Department of Justice noted that the City exhibited clear patterns of racially polarized voting with discriminatory effects on minority voting.

*See* Letter from James P. Turner to Dean G. Skelos and David F. Gantt (June 24, 1992), *available at* https://www.justice.gov/sites/default/files/crt/legacy/2014/05/30/NY-1070.pdf (last visited Aug. 28, 2022).

56. Federal courts have found elections in New York City to be racially polarized. *See Diaz v. Silver*, 978 F. Supp. 96 (E.D.N.Y. 1997), *aff'd sub nom. Silver v. Diaz*, 522 U.S. 801 (1997).

57. The existence of racially polarized voting coupled with the impact of adding almost a million foreign-citizen voters, the majority of whom are Hispanic and Asian, will significantly impact the voting strength of Plaintiffs, Black United States citizen voters.

58. Moreover, this polarization is exhibited in the lack of cohesion between Black and Hispanic voters and has been the subject of many discussions within political spheres. In 2020 in New York City, for example, President Trump doubled his support in precincts where Dominican nationals accounted for a majority of the population and more than doubled his support in Hispanic-heavy precincts. *See* John Binder, *Analysis: Support for Trump's Working-Class Agenda Surges Among Immigrants*, Breitbart (Dec. 28, 2020), https://www.breitbart.com/politics/2020/12/28/analysis-support-for-trumps-working-class-agenda-surges-among-immigrants/.

59. New York City's Hispanic voters support for Republican candidates in 2020 caused concern for Council Member Cumbo. While speaking to her fellow Council Members in opposition to the Bill she stated, "As I read in Dem Conference about during the presidential election how many of our Latino brothers and sisters voted Republican for President Trump. That concerns me of activating this particular bill because of that reason." **Exhibit 3** at 131. But her fellow Council Members disregarded her concerns.

## CLAIMS FOR RELIEF

### 52 U.S.C. § 10301 and 42 U.S.C. § 1983
### Discriminatory Purpose in Violation of the 15th Amendment to
### the United States Constitution and Section 2 of the Voting Rights Act

60. Plaintiffs re-allege and incorporate by reference the allegations set forth in all prior paragraphs of this Complaint.

61. Title 42, U.S.C. § 1983 authorizes suits for the deprivation of a right secured by the United States Constitution or the laws of the United States caused by a person acting under the color of law.

62. Section I of the Fifteenth Amendment to the Unites States Constitution provides that:

> The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.

63. The Fifteenth Amendment prohibits intentional racial discrimination by state actors.

64. Section 2 of the Voting Rights Act of 1965 prohibits the enforcement of any voting qualification or prerequisite to voting or any standard, practice, or procedure that has either the purpose or the result of denying or abridging the right to vote on account of race, color, or membership in a language minority group.

65. A violation of Section 2 of the Voting Rights Act may be based upon a finding of a discriminatory purpose alone.

66. Discriminatory purpose can be established by proof that race was a motivating factor in the decision to legislate Local Law 11. *See Arlington Heights*, 429 U.S. at 265-66. Direct evidence demonstrates that Local Law 11 was enacted with an impermissible racial intent.

67. By their own words, Council Members voiced their deliberate intent to use Local Law 11 to change the racial make-up of New York City's electorate.

68. The Council was aware of the discriminatory impact that Local Law 11 would have on the voting strength of Black voters as Council Member Cumbo requested that the vote be delayed until the effects on Black voters could be adequately addressed.

69. Furthermore, with knowledge that the Council was without legal authority to grant foreign citizens the right to vote, the Council disregarded procedural norms, the New York State Constitution, and the MHRL, and brazenly passed the Bill.

70. New York City has a long history of official discrimination in voting against minority citizens. This official discrimination has been recognized by the Department of Justice and by courts.

71. The Attorney General of the United States subjected the City to the preclearance provisions of Section 5 of the Voting Rights Act due to historically low registration rates of minority voters and or existence of a test or device that restricts the opportunity to register to vote.

72. Federal courts have found elections in New York City to be racially polarized. *See Diaz v. Silver*, 978 F. Supp. 96 (E.D.N.Y. Feb. 26, 1997), *aff'd sub nom. Silver v. Diaz*, 522 U.S. 801 (1997). The existence of racially polarized voting along with the impact of adding almost a million foreign-citizen voters will result in abridgement of Black voting strength in New York City.

73. All of the relevant indicia demonstrate that an impermissible racial purpose was a motivating factor in the passage of Local Law 11. Indeed, the lead sponsor made it plain, "Yet because we as a city have decided that this city has changed the color of the skin of people coming to this city, then we change it who will be voting in this city." **Exhibit 2** at 108.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray for entry of a judgment:

1. Declaring that Local Law 11 violates the prohibitions on discriminatory purpose contained in the Fifteenth Amendment to the United States Constitution and Section 2 of the Voting Rights Act;

2. Declaring that Local Law 11 was adopted with an impermissible racial intent in violation of the guarantee of the Fifteenth Amendment to the United States Constitution and Section 2 of the Voting Rights Act;

3. Enjoining Defendants, their agents, officers, employees, and successors from registering noncitizens to vote and prohibiting Defendants from counting votes cast by foreign citizens;

4. Awarding Plaintiffs compensatory and nominal damages pursuant to 28 U.S.C. § 1343 or any other applicable law for deprivation under color of law of their rights secured by the Constitution of the United States and an Act of Congress, and granting such further relief the Court deems just and proper, including all other injunctive relief available to the Court;

5. Ordering the Defendants to pay Plaintiffs' reasonable attorney's fees, expert fees, including litigation expenses and costs, pursuant to 52 U.S.C § 10310(e), 42 U.S.C. § 1988, and any other applicable law;

6. Granting Plaintiffs such further relief the Court deems just and proper including all other injunctive relief available to the Court.

Dated: August 29, 2022

Respectfully submitted,

Heather D. Crosley
LOCAL COUNSEL

Maureen Riordan*
J. Christian Adams**
Kaylan Phillips**
Noel Johnson**
Charlotte M. Davis**
Public Interest Legal Foundation
32 E. Washington Street, Ste. 1675
Indianapolis, IN 46204
Tel: (317) 203-5599
mriordan@publicinterestlegal.org
adams@publicinterestlegal.org
kphillips@publicinterestlegal.org
njohnson@publicinterestlegal.org
cdavis@publicinterestlegal.org
heatherdcrosley@gmail.com

   *Application for admission forthcoming
   **Application for admission *pro hac vice*
     forthcoming